THE STATE OF KANSAS v. JOSEPH HUFF.

No. 15,313   (90 Pac. 279.)

SYLLABUS BY THE COURT.

1 CRIMINAL PROCEDURE—*Discharge of Jury Found Necessary— Defendant Not Acquitted.* An entry upon the docket of a justice of the peace in a misdemeanor case reciting that "the jury, after being out for a reasonable time, about one and one-half hours, came into court and reported that it was impossible for them to agree," and that "the court, after being satisfied that the jury could not agree, discharged them," shows that as a result of a judicial investigation of the question a finding was made that the discharge of the jury was necessary, and therefore prevents such discharge from having the effect of an acquittal.

2. ———— *Abandonment of a Count—Dismissal without Prejudice—Former Jeopardy.* Where in a criminal action the same offense is charged in two counts, and after the evidence is in the prosecuting attorney announces that he will rely upon only one of them, and thereafter the jury are necessarily discharged and the case properly dismissed without prejudice, such abandonment of one count will not operate as a bar to a further prosecution.

3. ———— *Requisites of Plea in Bar after Election of Counts and Dismissal.* Where in a plea in bar a defendant in a criminal action relies upon the fact that after a jury had been impaneled the state abandoned one of two counts in a complaint formerly prosecuted against him, and such counts appear to have been intended as different methods of charging

the same offense, in order for the plea to be good upon its face it must show not only that the count which was abandoned charged the identical offense for which he is afterward prosecuted but that the two counts related to separate offenses.

4. PHYSICIANS AND SURGEONS—*Prosecution for Practicing without Authority—Allegations and Proof.* An allegation that a defendant "did . . . prescribe and recommend for a fee drugs and medicines for the cure and relief of bodily infirmity and disease of another person" is supported by evidence that he treated a person, who was afflicted with what he pronounced to be a cancer, by the external application of a substance which he represented as being a remedy therefor, under a contract that he should receive fifty dollars down and fifty more when a cure was effected.

5. —— *If a Fee be Accepted, the Fact that "Domestic Medicines" Were Used is Not a Defense.* In a prosecution under a statute making it a misdemeanor for one not having a certificate of qualification from a state board to practice medicine, and providing that "any person shall be regarded as practicing medicine . . . who shall prescribe, or who shall recommend for a fee, for like use, any drug or medicine," but that the act shall not apply to "the administration of domestic medicines" (Gen. Stat. 1901, § 6674), where the defendant is charged with recommending a medicine for a fee it is not material to inquire whether the medicine alleged to have been so recommended was a domestic medicine within the meaning of the phrase as used in the act; the fact that it was a domestic medicine would not constitute a defense.

Error from Franklin district court; CHARLES A. SMART, judge. Opinion filed April 6, 1907. Affirmed.

*Fred S. Jackson,* attorney-general, *John S. Dawson,* assistant attorney-general, and *W. B. Pleasant,* county attorney, for The State.

*W. J. Costigan,* and *John T. Little,* for appellant.

The opinion of the court was delivered by

MASON, J.: Joseph Huff appeals from a conviction upon a charge of violating the statute which forbids any one to practice medicine who has not received a certificate of qualification from the state board of medical registration and examination. The determina-

tion of the case involves the consideration of portions
of sections 6675 and 6674 of the General Statutes of
1901, reading as follow:

"From and after the first day of September, 1901,
any person who shall practice medicine and surgery
or osteopathy in the state of Kansas without having
received and had recorded a certificate under the pro-
visions of this act, or any person violating any of the
provisions of this act, shall be deemed guilty of a mis-
demeanor."

"Any person shall be regarded as practicing medi-
cine and surgery within the meaning of this act who
shall prescribe, or who shall recommend for a fee, for
like use, any drug or medicine, or perform any surgical
operation of whatever nature for the cure or relief of
any wounds, fracture, or bodily injury, infirmity or
disease of another person, or who shall use the words
or letters 'Dr.,' 'doctor,' 'M. D.,' or any other title
in connection with his name which in any way repre-
sents him as engaged in the practice of medicine and
surgery; but nothing in this act shall be construed as
interfering with any religious beliefs in the treatment
of disease, provided that quarantine regulations re-
lating to contagious diseases are not infringed upon.
All persons who practice osteopathy shall be registered
and licensed as doctors of osteopathy, as hereinbefore
provided, but they shall not administer drugs or medi-
cines of any knd nor perform operations in surgery.
This act shall not apply to any commissioned medical
officer of the United States army, navy, or marine serv-
ice, in the discharge of his official duties; nor to any
legally qualified dentist, when engaged in the legitimate
practice of his profession; nor to any physician or
surgeon who is called from another state or territory in
consultation with a licensed physician of this state, or
to treat a particular case in conjunction with a licensed
practitioner of the state, and who does not otherwise
practice in the state. Nor shall anything in this act
apply to the administration of domestic medicines, nor
to prohibit gratuitous services."

The information contained three counts. The first,
after alleging that the defendant had not received a
certificate authorizing him to practice medicine, and

that he was not within any of the exceptions of the statute, charged that he "did . . . unlawfully prescribe and recommend for a fee drugs and medicines for the cure and relief of bodily infirmity and disease of another person . . . to wit, Florence McNutt." The second and third were substantially the same, except that other names were substituted for that of Mrs. McNutt. A verdict of guilty was returned upon the first and second counts, and sentence was pronounced upon the second only.

The defendant presented a plea in bar, which showed these facts: Prior to his arrest in the present case he had been prosecuted before a justice of the peace upon a complaint containing two counts, each charging in general terms a violation of the medical practice act. Neither gave the name of the person he was said to have attended. The only difference between them lay in the dates and in the phraseology employed. The first charged that the defendant "on or about the 15th day of April, 1906, . . . did . . . unlawfully and wilfully prescribe and recommend for a fee drugs and medicines for the cure and relief of infirmity and disease of another person"; the second, that he, "on or about the 15th day of May, 1906, and for more than a year next prior thereto, . . . was unlawfully and wilfully engaged in the practice of medicine by then and there prescribing and recommending for a fee drugs and medicines for the cure and relief of infirmity and disease of other persons." Otherwise they were substantially alike. At the conclusion of the evidence the county attorney announced that the state "did not ask for a conviction on the first count, but would rely for a conviction on the second count." The case was then argued and submitted. The ensuing proceedings are thus shown by the docket: "The jury, after being out for a reasonable time, about one and one-half hours, came into court and reported that it was impossible for them to agree. The court, after be-

ing satisfied that the jury could not agree, discharged them." Afterward an order of dismissal without prejudice was made. The plea in bar alleged that the complaint was for the same offense as that charged in the information.

The state demurred to the plea, and the court sustained the demurrer. The defendant now complains of this ruling, and makes two contentions: (1) That the discharge of the jury was equivalent to an acquittal and is a bar to the present prosecution, inasmuch as the record does not show a sufficient investigation and determination by the justice of the question whether such discharge was necessary; (2) that the abandonment of the first count after a jury were impaneled had a like effect and is attended with the same consequence. Neither contention is well founded.

In *The State v. Klauer,* 70 Kan. 384, 78 Pac. 802, the discharge of a jury was held to be a final disposition of a criminal case because "no judicial investigation or determination was made at the time and no finding of the necessity for a discharge entered of record." (Syllabus.) There, however, it was affirmatively shown that "the court made no investigation or inquiry at the time the jury were brought into court and discharged as to whether they could probably agree or not, and the court made no judicial investigation or determination of the question at that time, and made no finding thereon at the time the jury were discharged." (Page 387.) Here the docket recites that before discharging the jury the justice was satisfied that they could not agree. This is a sufficient record of what amounts to a finding that it was necessary to discharge the jury, and implies that a judicial examination was made of that question. It is not necessary that the record should show the full extent of the inquiry, the evidence received, or the grounds of the decision. Nor is the correctness of the conclusion reached open to collateral attack. There was therefore

no error in sustaining the demurrer to the plea in bar, so far as this feature of it is concerned.

Apparently the two counts of the complaint were intended as two methods of charging the same offense. It has been held that in such a case, where a conviction is had upon one count, even a verdict of not guilty on the other will not prevent a subsequent hearing on both counts if a new trial is granted at the request of the defendant. (*Lesslie v. The State,* 18 Ohio St. 390; *Jarvis v. The State,* 19 Ohio St. 585.) However that may be, the abandonment of one count under such circumstances, being merely a final election not to rely upon the particular manner therein employed to charge the offense, does not prevent a further prosecution upon the other count in that proceeding, and consequently cannot be a bar to a new action if the second one after a mistrial is properly dismissed without prejudice. If, therefore, the two counts of the complaint related to the same offense, the fact that the first one was abandoned presented no obstacle to the subsequent proceeding by information. If, on the other hand, the two counts did not refer to the same offense, the defendant can now derive no advantage from the fact. The plea in bar did allege that the information was "founded upon the same facts and circumstances as was said first count in said complaint," but it also alleged in substance, if not in express terms, that the second count of the complaint—the one which was submitted to the jury, and upon which they failed to agree—likewise charged the same offense as the information. No attempt was made to distinguish between the several counts of the information. The plea in bar was not directed against any particular count, but against the entire prosecution. Its allegations were perfectly consistent with the hypothesis that the two counts of the complaint referred to the same offense—that while the information charged the same offense as the first count, it also charged the same offense as the second

count. To have been good on its face the plea should have shown affirmatively not only that the information charged the same offense as the first count of the complaint but also that the two counts were for different offenses, in order that it should have been made to appear that the new action was not a renewal of that in which the jury disagreed. For these reasons the demurrer to the plea in bar was rightly sustained.

There is little room for controversy as to the facts in the case. The defendant took the stand in his own behalf and testified that he was a farmer; that he was not a doctor; that he manufactured from vegetables grown on his own farm what he believed to be a remedy for cancer; that he had used it upon from fifty to seventy-five different patients, one of whom was Mrs. Stewart, the person named in the second count; that he applied it himself, describing the process thus: "I take a little stick and get a little medicine on it, and put it on the cancer, the diseased part, and that works from fifteen minutes to half an hour until it works the strength out of the medicine, and then I clean that off and apply it again." The state's evidence showed, or tended to show, that the defendant had treated Mrs. Stewart under a contract by the terms of which he was to receive fifty dollars down and a like amount when a cure should be effected, and that the first fifty dollars had been paid to him.

It is claimed on behalf of the defendant that the evidence—the scope of which is fairly indicated by the foregoing statement—did not warrant a conviction under the pleading, inasmuch as the application of the purported remedy was a surgical operation, while the information charged only the practice of medicine, and nowhere even mentioned surgery. To discuss the technical distinctions relied upon to sustain this contention would be a useless waste of effort. We are concerned only with the interpretation of the Kansas act, which provides that for its purposes any one shall

be regarded as practicing medicine and surgery "who shall prescribe, or who shall recommend for a fee, for like use, any drug or medicine. . . . for the cure or relief of any . . . infirmity or disease of another person." (Gen. Stat. 1901, § 6674.) The language quoted is followed in the information, and if the defendant's acts are within its terms it is immaterial whether they also amounted to the practice of surgery. But it is further argued that "the prescribing and recommending denounced by the act refers to drugs and medicines to be used by the patient himself," and that as the defendant in this case applied the remedy he was not within the terms of this part of the statute. Possibly the word "prescribe" may sometimes have the meaning thus attributed to it, although it is not clear why the same person may not prescribe and administer a remedy. But a broader intention is evidenced by the accompanying phrase: "or . . . recommend for a fee, for like use," which appears to have been employed to guard against any narrow or technical construction. The jury were abundantly justified in finding that the defendant did not contract for the payment to him of the hundred dollars either as the purchase-price of the material he furnished or as compensation for his service in applying it, but that the charge was essentially one for imparting his peculiar knowledge of its curative powers, and that the transaction therefore amounted to recommending a medicine for a fee within the letter and spirit of the law.

Several assignments of error involve the consideration of the meaning of the provision of the medical act that nothing therein shall apply to "the administration of domestic medicines." (Gen. Stat. 1901, § 6674.) The trial court instructed the jury that "the term 'domestic medicines,' as used in this law, means medicine as practiced by unprofessional persons in their own families or households." This instruction was manifestly based upon the definition of the phrase

"domestic medicine" found in several standard dictionaries. The Century and the Imperial define it as "medicine as practiced by unprofessional persons in their own families"; the Encyclopædic, as "the practice or use of medicine by unprofessional persons in their own households." Objection is taken to the application made of these definitions upon the somewhat plausible ground that "medicine" is there used abstractly—referring to the science or practice of medicine, while in the statute "medicines" is obviously used concretely, referring to substances, as a synonym for "remedies." The force of this objection is lessened by having regard to the entire phrase employed in the statute—"the administration of domestic medicines." Although it can hardly be strictly accurate to say that the bare words "domestic medicines" mean "medicine as practiced by unprofessional persons in their own families," the expression "the administration of domestic remedies," taken by itself, might well be thought to mean just that. Of course if the instruction conveyed a correct idea as to the force of the statute it is not material that it was open to verbal criticism.

The Kansas medical act does not follow closely that of any other state, but it bears internal evidence of having been modeled in part upon the Ohio statute of 1900 (Laws of Ohio, 1900, p. 197), where the corresponding language is that the act shall not be construed to prohibit "the domestic administration of family remedies." (Page 201.) Precisely the same expression is found in the laws of California, Massachusetts, and New Mexico. Those of Indiana and Utah read: "the administration of family remedies"; of Nebraska: "the administration of ordinary household remedies." In Illinois in a recent revision "the domestic administration of family remedies" was changed to "the administration of domestic or family remedies." (Laws of Illinois, 1899, p. 275, § 7.) These slightly

different but substantially similar phrases seem intended to express the same essential thought. That they were in such general use when our statute was enacted suggests a purpose to cover about the same ground by the words "the administration of domestic medicines (Gen. Stat. 1901, § 6674); that is, the domestic administration of medicine—the administration of medicine in one's own family.

To have recourse again to the lexicographers, it may be noted that Appleton's Medical Dictionary and Gould's Illustrated Dictionary of Medicine define "domestic medicine" as "the use of domestic remedies," but as neither attempts to give the meaning of "domestic remedy" the definition is not illuminating. If, however, "domestic medicine" is the use of medicine in one's own family, and is also the use of domestic remedies, it would seem logically to follow that domestic remedies or domestic medicines are those which one uses in his own household. Foster's Encyclopædic Medical Dictionary (by Frank P. Foster, who also edited Appleton's Medical Dictionary) contains, under the word "domestic": "Pertaining to the household, to one's own home; . . . of remedies prepared in one's own house or kept there for use in the absence of a physician." This certainly has some tendency to sustain the instruction given. But the matter is not to be determined by mere reference to the dictionaries. Lippincott's Medical Dictionary says that "domestic medicine" is "medicine as practiced by non-professional persons." The acceptance of that definition would make the exception as broad as the act. The real meaning of the law must be sought by considering it as a whole—in the harmonious construction of its various parts. The greatest difficulty with the view adopted by the trial court seems to be that as the statute permits gratuitous services of all kinds there could be little or no force to a further provision that any one might administer medicine in his own family, inasmuch as it

can hardly be thought to have been within the contemplation of the legislature that a charge would ever be made for such administration. This difficulty is so serious that rather than attempt its solution we prefer to inquire whether under any reasonable view of the law the defendant could have been prejudiced by the instruction referred to.

The defendant's attorneys did not submit to the court any interpretation of the clause in question, and they now maintain in effect that no definition of the word "domestic" was necessary; that it is a primitive word, not capable of being made clearer by other terms; that only confusion could result from an attempt to explain it; that it should have been left to the jury to say what domestic medicines were, and whether the substance applied by the defendant was a domestic medicine. To this we cannot agree. There are of course some words (as was said of "fire" in *Insurance Office v. Woolenmill Co.*, 72 Kan. 41, 82 Pac. 513) which are so common and so well understood that they require no definition. But "domestic" is not one of them. It is susceptible of a variety of meanings and shades of meaning, according to the connection in which it is employed. As used in the statute we do not believe that it referred to medicines of home manufacture, or to those manufactured from vegetables grown at home; if it did not have the precise meaning attributed to it by the court it must have had much the same force as in the pharmacy act. No other reasonable construction occurs to us, and none has been suggested. There it is provided that "in rural districts, where there is no registered pharmacist within five miles, it shall be lawful for retail dealers to procure license from the board of pharmacy at a fee of two dollars and fifty cents annually, to sell the usual domestic remedies and medicines." (Gen. Stat. 1901, § 6687.) In determining the meaning of this we are aided by judicial and legislative construction. In *Cook v. The People*, 125 Ill. 278, 17 N. E. 849, it was said that under a similar statute the jury were

warranted in finding from the evidence (the character of which was not shown) that quinine was not one of the usual domestic remedies referred to. In *The People v. Fisher*, 83 Ill. App. 114, the court approved an instruction reading:

"Although the jury may believe from the evidence that the defendant sold iodine and quinine, yet if they further believe from the evidence that they are domestic remedies, then the defendant is not liable for such sales." (Page 116.)

The entire discussion of the subject was as follows:

"The sale of 'domestic remedies' is exempted from the statutory provisions under which Fisher was being prosecuted. It is objected to this instruction that there is no evidence on which to base it; the only evidence in the record being that iodine is an irritant poison, and that quinine is a drug prepared by manufacturing chemists. The same objection is made to the modification of an instruction offered by the plaintiffs in error. It is also urged that as the supreme court has held inferentially in the case of *Cook v. The People*, 125 Ill. 278, 17 N. E. 849, that quinine is not a domestic remedy, it was error to submit to the jury, as the instructions did, the determination of whether that drug is a domestic remedy. The logic of that contention is that quinine, as a matter of law, is a drug that can be legally sold only by a registered pharmacist and is not a domestic remedy. All that was said by the supreme court in *Cook v. The People, supra,* was that the court thought that 'the jury were fully warranted in finding, from the evidence, that quinine was not one of the usual domestic remedies referred to in said proviso.' We are clearly of the opinion that in prosecutions under this act the determination of whether the drug sold is a domestic remedy is a question of fact for the jury. Nor do we think the court erred in so instructing, because the only testimony heard upon this point was that of Fleury, who stated that iodine was an irritant poison, not in common use in the household, and that quinine was a drug prepared by manufacturing chemists. Because of his testimony the jury were not required to close their eyes against their own experience in the use of such drugs.

"We cannot agree with counsel for the plaintiffs in

error that domestic remedies, within the meaning of the statute, are confined to 'harmless concoctions of teas and herbs,' which those unlearned in medical and scientific lore can prepare at home, and do not include drugs requiring scientific knowledge and apparatus to prepare. We think a drug, although prepared by skilled chemists and scientific apparatus, may come into such common use and be so well understood in its effects by people without medical knowledge as to make it a domestic remedy.

"For instance, there are portions of territory lying within what is known as the Mississippi valley where 'chills and fever' are of such frequent occurrence (and recurrence) that quinine, in certain seasons of the year, is almost as common an article of household use as the ordinary necessaries of life, and the good house-wife, when she doses the children from the family bot-tle, understands its effect about as well as the licensed pharmacist. It is a matter of common experience that iodine is frequently used in the household as an anti-dote for wild-ivy poison, ringworm and other skin affections. The mere fact that it is an irritant poison would not bring it out of the pale of 'domestic reme-dies'." (Page 116.)

The New York pharmacy act originally contained a provision permitting "the sale of the usual domestic remedies by retail dealers in the rural districts." (Laws of New York, 1884, ch. 361, § 11.) Later a definition was added of which the following was the substance and finally the form:

"The term 'usual domestic remedies,' here employed, means medicines, a knowledge of the properties of which and dose has been acquired from common use and includes only such remedies as may be safely em-ployed without the advice of a physician." (Laws of New York, 1893, ch. 661, § 187. See, also, Laws of New York, 1887, ch. 676, § 4.)

Still later the proviso was so changed as to permit the sale by unlicensed persons of only certain enumer-ated drugs. (Rev. Stat. New York, 1901, p. 2959, § 199.)

It will be observed that the meaning pointed to in these expressions is in a way a modification of that

adopted by the trial court. The phrase "domestic medicines," referring to those remedies which are in fact used by a non-professional person in his own home, appears to have been diverted from its original and literal import, perhaps in part by the addition of the qualification "usual," so as to signify such substances as are commonly kept by non-professional persons in their own homes for use as remedies in the absence of a physician, being necessarily substances the effect of which is a matter of general knowledge, so that no special training is required for their safe administration. If this signification be accepted as that intended in the medical law, it is obvious that cases may arise in which it is proper to submit to a jury the question whether a particular remedy, which a defendant may be charged with administering under such circumstances as to make the act unlawful, was a domestic medicine. But no such situation is presented here. There is nothing in the evidence in this case to suggest that the substance applied by the defendant was one in common use or one the effect of which was generally understood.

But apart from this, other considerations compel the conclusion stated. The statute in general terms forbids one not having a certificate to practice medicine; it adds that any person shall be regarded as practicing medicine who shall prescribe or recommend for a fee for like use any drug or medicine; that registered osteopaths may practice their profession but "shall . . . not administer drugs or medicines of any kind"; and that nothing in the act shall "apply to the administration of domestic medicines" or "prohibit gratuitous services." (Gen. Stat. 1901, § 6674.) It would defeat the manifest purpose of the law to hold that under these provisions a defendant charged and proved to have received money for recommending a certain substance as a cure for disease might exculpate himself by showing that the substance he recommended was a domestic medicine, in the sense that it was a

well-known remedy, the effect of which was a matter of common knowledge. A non-professional person is permitted under the law to administer domestic medicines, but not to take pay for recommending their use. The theory of the state is that one who proposes to ask and receive compensation for advice as to the use of medicines thereby holds himself out as possessed of special and peculiar information on the subject, and that it is the province of the state to see that he possesses it or in default of proof thereof to prevent his making the unfounded claim a source of revenue. To the charge that an incompetent person has unlawfully taken pay for recommending the use of a particular remedy it is no answer to say that the remedy is one the effect of which is a matter of common knowledge, and which for that reason may be administered by any one without a violation of the law.

Under the defendant's own statement he was guilty of the offense charged against him, if for a fee he recommended the use of his medicine as a remedy for cancer, whether it was a "domestic medicine" or not. The jury by their verdict found that he did so, and the evidence abundantly justified the verdict. The instruction referred to therefore could not have prejudiced him, and constituted no error of which he can complain.

A final claim of error is based upon the refusal of the court to give a peremptory instruction to the jury at the conclusion of the state's evidence to return a verdict of not guilty, upon the ground that it had not been shown that the defendant did not come within any of the exceptions of the statute—for instance, that he was not a medical officer of the army or navy. This court has already in effect decided, in accordance with the general rule, that it is incumbent upon the defendant to produce evidence upon such matters, as they lie peculiarly within his knowledge. (*The State v. Wilson,* 62 Kan. 621, 64 Pac. 23, 52 L. R. A. 679.) Moreover, the defendant in this case testified that he was a farmer, living in the county where he was tried, and it

clearly appeared that he was neither an officer, a foreign physician, nor a dentist engaged in the practice of his profession. The complaint on this score is without substance.

The judgment is affirmed.