No. 33,760

THE STATE OF KANSAS, ex rel. CLARENCE V. BECK, Attorney General, *Appellee,* v. W. W. COOPER, *Appellant.*

(78 P. 2d 884)

Opinion filed May 7, 1938.

*C. C. McCullough,* of Emporia, for the appellant.

*Clarence V. Beck,* attorney general, *Theo. F. Varner,* assistant attorney general, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was a suit on the relation of the attorney general to enjoin the alleged unlawful practice and the unlawful advertising of the practice of medicine and surgery. The injunction was allowed and the defendant appeals.

Defendant in substance admits: He had obtained no license to engage in the practice of medicine and surgery or any other branch of the healing arts; he advertised and held himself out to the public as one who treated and cured cancer; he received pay for his services. Defendant in substance contended: His treatment consisted in the application of a compound of certain drugs, known only to himself, which, if applied in time, would kill cancer; he denied he had ever claimed to be a practicing physician as defined by the laws of this state, but insisted he was versed in the methods and ways of destroying cancer; that his treatment of cancer consisted in the application of a paste to a cancer itself and not to the human body and as a result of such treatment the cancer dies and the healing processes eject it from the body the same as any other foreign substance; the ingredients of his compound destroyed only abnormal tissue and had no effect on normal tissue; the remedy could be applied by anyone having access to the formula, it did not require the knowledge or professional services of a physician.

The defendant was eighty-six years of age and claimed to have learned something of the cure of cancer from his father. For many years defendant sold Baker's medicines, household remedies. As a result of numerous inquiries and discussions with others concerning the treatment of cancer he finally prepared a compound of his own.

It was in the form of a paste and was applied to the affected portion of the body. He conducted the practice in his home. In the front yard appeared a sign containing the following advertisement:

"CANCER HOME
We Guarantee To
KILL & REMOVE CANCERS
Or No Pay
Without Knife, Radium, X Ray, or Electricity
W. W. Cooper."

Among his advertisements was also the following:

"Cancers.
Attention:

"Cancer is a very old disease. We can trace it almost as far back as we have knowledge of civilization. Familiar to the earliest physicians, it has persisted through the ages, and is baffling their efforts as effectively today as it did hundreds of years ago. And it is a fact there is no dangerous disease so easily cured as cancer, and none more dangerous if neglected too long or improperly treated.

"We guarantee to kill and remove them—or no pay. Over thirty years successful practice and no failures. Proof of success is success itself. Write and we will send you the proof.

W. W. COOPER, Mgr.

THE
CANCER HOME
ALTOONA, KANSAS."

Other forms of advertisements were employed, including testimonials from patients. By reason of his age he had concluded to have his daughter and son-in-law assist him in his practice. Neither of them was licensed to practice any healing art. There was testimony to the effect that the defendant had moved from his former home and was contemplating converting that place into a cancer clinic, which was to be operated by his daughter and son-in-law, under his supervision. He had given them his formula and planned to oversee the work until they were as conversant therewith as he.

The law expressly enjoins the duty upon the secretary of the State Board of Registration and Examination for the practice of medicine and surgery to see that the act providing for such practice is enforced. (G. S. 1935, 65-1006.) One Raymond Tice, a student of medicine, was employed to obtain information concerning reported unlawful practices. Tice consulted the defendant concerning a pigmented nevus or mole under his arm, during September of 1936 and May of 1937. The substance of Tice's testimony was as

follows: In the first consultation defendant advised him the mole constituted a cancer and was in a very bad place, but it could be cured; the fee was $50; he paid $3 at the time and defendant put some paste on adhesive tape and applied it to the mole; he was to return in about two weeks; immediately upon leaving defendant's residence the paste was removed; he returned in May of 1937, and a similar application was made; the fee was then reduced to $25 and he paid $5, and obtained a receipt therefor; upon leaving he again promptly removed the paste and it was examined by C. N. Watson, a chemist and bacteriologist at Independence, Kan.; the testimony of the defendant was to the effect that he was not certain whether Tice was afflicted with cancer, but that the paste would not be harmful in any event.

The testimony of Watson, in substance, was: That he made an analysis of the paste on the adhesive tape, both quantitative and qualitative, and the analysis showed that the paste contained about fifty percent chloride of zinc, starch and some vegetable tissue, indicating it was a mucilaginous drug called althaea, the exact proportions of the compound being thirty-two percent water and fifty percent chloride of zinc and starch, which had been caramelized, making up the balance; he was familiar with the chemical properties of zinc chloride and that it was a caustic which would burn or eat animal tissue; as a chemist he was familiar with pastes or compounds containing similar formulae as that disclosed by the analysis; those formulae are given in the national dispensary and United States dispensary used by the medical profession; the compound used by the defendant was similar to that of Canquoin's paste used as a caustic in the treatment of cancer.

The testimony of the defendant was to the effect he always used the same paste and that its active ingredient on the cancerous tissue was zinc chloride.

The pertinent testimony of Dr. J. G. Hughbanks, a witness for the state, was in substance as follows: he was acquainted with and had an opinion concerning the effect of an application of paste composed of thirty percent water, fifty percent zinc chloride, flour, starch and althaea; when applied to tissue of the human body, the effect of such application was to destroy all tissue with which it came in contact. The only one of the ingredients which had that reaction was zinc chloride. It is an escharotic or caustic and will destroy normal tissue as well as abnormal tissue. Zinc chloride

was first used in the treatment of cancer by a Frenchman named Canquoin over a hundred years ago. The treatment of external cancer by zinc chloride is used to a limited extent among the medical profession at this time. Some dermatologists use it with a great deal of caution. It can only be used by men who have an appreciation of the danger of the drug. The reason for the caution is that the caustic leaves extensive scars and may cause clots to form in the blood stream during treatment, causing a pulmonary embolus. The preparation is certainly not what is termed a "home remedy." It is not used extensively by the medical profession because of its known dangers, and better results can be obtained with X ray or knife and with less danger. It is impossible to distinguish by superficial examination different types of cancer from a benign growth.

The statute defining the practice of medicine and surgery does not prohibit the administration of domestic medicines or gratuitous services. (G. S. 1935, 65-1005.) The trial court found defendant's compound was not a home remedy; his services were not gratuitous, he had obtained no license for the practice of medicine and surgery, and that his practice was unlawful.

Much of defendant's argument is directed against the wisdom of the law which prohibits his practice without a license. With that contention courts, of course, cannot be concerned. That is a prerogative of the legislative and not of the judicial branch of government.

Defendant urges he was not engaged in the practice of medicine or surgery. The answer must be found in the interpretation of the statute. The statute defining that practice is G. S. 1935, 65-1005. The pertinent portion thereof reads:

"Any person shall be regarded as practicing medicine and surgery within the meaning of this act who shall prescribe, or who shall recommend for a fee, for like use, *any drug or medicine,* or perform any surgical operation of whatsoever nature for the *cure or relief* of any wounds, fracture or bodily injury, *infirmity or disease of another person,* . . . or any person *attempting to treat the sick or others afflicted with bodily or mental infirmities,* or any person *representing or advertising himself by any means or through any medium whatsoever or in any manner whatsoever, so as to indicate that he* is authorized to or *does practice medicine or surgery* in this state, or that he is authorized to or *or does treat the sick or others afflicted with bodily infirmities,* . . ." (Italics inserted.)

G. S. 1935, 65-1006, prescribes the penalties for engaging in the practice without first obtaining a license to do so. It is true the record discloses defendant treated many patients without charging

a fee in the event of their inability to pay. It also discloses defendant's frank admission he charged for his services and based his fee on ability of the patient to pay. It cannot be doubted the practice in which he engaged, without a license, was clearly prohibited. There was strong evidence to support the specific finding of the trial court that the compound used was not a home remedy. (For a discussion of what constitutes home remedies, see *State v. Huff,* 75 Kan. 585, 592-598, 90 Pac. 279.) Where the evidence concerning a specific finding is conflicting this court does not weigh the evidence or pass upon the credibility of witnesses. That is solely the province of the trial court. In such cases this court examines the record only for the purpose of ascertaining whether there is substantial evidence to support the findings made, and not whether there is evidence to the contrary. (*Settle v. Glenn,* ante, pp. 502, 503, 78 P. 2d 57.) Moreover, the evidence of the defendant, when properly analyzed, was not that his compound constituted a home remedy. His evidence was quite to the contrary. It was to the effect that it could be applied without danger by anyone who had access thereto. He contended, however, it was a combination of drugs known only to himself. For this knowledge, claimed to be possessed solely by himself, and for the treatment of the patient he charged a fee. In *State v. Huff,* supra, it was held:

"An allegation that a defendant 'did . . . prescribe and recommend for a fee drugs and medicines for the cure and relief of bodily infirmity and disease of another person' is supported by evidence that he treated a person, who was afflicted with what he pronounced to be a cancer, by the external application of a substance which he represented as being a remedy therefor, under a contract that he should receive fifty dollars down and fifty more when a cure was effected." (Syl. ¶ 4.)

"In a prosecution under a statute making it a misdemeanor for one not having a certificate of qualification from a state board to practice medicine, and providing that 'any person shall be regarded as practicing medicine . . . who shall prescribe, or who shall recommend for a fee, for like use, any drug or medicine,' but that the act shall not apply to 'the administration of domestic medicines' (Gen. Stat. 1901, § 6674), where the defendant is charged with recommending a medicine for a fee it is not material to inquire whether the medicine alleged to have been so recommended was a domestic medicine within the meaning of the phrase as used in the act; the fact that it was a domestic medicine would not constitute a defense." (Syl. ¶ 5.)

For other cases which discuss the application of G. S. 1935, 65-1005, to various practices of the healing arts and advertisements concerning such practices, see, also; *State v. Johnson,* 84 Kan. 411,

114 Pac. 390; *State v. Peters,* 87 Kan. 265, 123 Pac. 751; *State v. Douglas,* 124 Kan. 482, 260 Pac. 655; *Slocum v. City of Fredonia,* 134 Kan. 853, 8 P. 2d 332.

Defendant suggests that the prohibiting of the practice as conducted by him violates his inalienable rights and the fourteenth amendment to the federal constitution. No authorities are cited in support of the contention. The law does not prohibit the practice of medicine and surgery. It simply prescribes certain requirements with which defendant and others must comply in order to qualify for the practice. That the legislature, speaking for the people, has power to prescribe reasonable restrictions and qualifications touching the practice of the healing arts in any of its departments, without violating any constitutional rights, is clear. Such legislation constitutes a valid exercise of police power. (*State v. Creditor,* 44 Kan. 565, 24 Pac. 346; *State v. Wilcox,* 64 Kan. 789, 68 Pac. 634; *Meffert v. Medical Board,* 66 Kan. 710, 72 Pac. 247; *State v. Johnson,* 84 Kan. 411, 413, 114 Pac. 390.) The fourteenth amendment to the federal constitution does not affect valid police regulations enacted by the states. (*Mugler v. Kansas,* 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205; *Johnson v. Reno County Comm'rs,* 147 Kan. 211, 216, 75 P. 2d 849.)

Defendant urges the state has a remedy at law under its criminal statute (G. S. 1935, 65-1006), and hence it will not be permitted to resort to the equitable remedy of injunction. It is true that ordinarily equity does not enjoin the commission of crime. The legislature, however, in order to more adequately protect the health and welfare of its citizens, saw fit to make effective the regulation and control of the practice of medicine and surgery by enlarging existing remedies. It therefore provided the preventive measures of injunction and quo warranto. It expressly declared those remedies should constitute additional remedies to the existing remedy of criminal prosecution and that they were not provided in lieu thereof. (Laws 1937, ch. 270.) No valid reason is advanced and no authorities are cited holding the legislature is without power or authority to provide such additional remedies. The remedy of injunction was recognized in this state in a suit to prevent the operation of a retreat for the insane or persons of unsound mind, although its operation without a license constituted a misdemeanor and there was no express statutory authorization to proceed by injunction. (*State v. Lindsay,* 85 Kan. 79, 116 Pac. 207.) It was there said:

"It has often been broadly stated that an injunction will not lie to prevent the commission of a crime or penal offense, but this is subject to important qualifications. The remedy has been upheld in some situations where the act enjoined was criminal. . . .

"Courts of equity are reluctant to use the process of injunction where the remedy by indictment or information is efficacious, but will not hesitate where the remedy is not adequate and it is necessary to protect the rights of the public or an individual. A court is not powerless to prevent the doing of an act merely because it is denounced as a public offense. (*In re Debs, Petitioner,* 158 U. S. 564; *The North American Ins. Co. v. Yates,* 116 Ill. App. 217; *The Columbian Athletic Club v. State, ex rel. McMahan,* .143 Ind. 98; *Commonwealth v. McGovern,* 25 Ky. Law Rep. 411; *State, ex rel., v. Canty,* 207 Mo. 439.) A related subject is considered in *The State v. Snelling,* 71 Kan. 499." (p. 83.)

In 14 R. C. L. Injunctions, section 81, the rule is stated thus:

"It is also competent for the state, within the constitutional limits of its legislative powers, to declare any act criminal, and make the repetition or continuance thereof a public nuisance, so as to enable the courts, on conviction, to pronounce judgments of abatement, or to vest in courts of equity the power to abate them by injunction." (p. 380.)

This court has recognized the fact there is a wide difference of views as to the use of injunction where the violation of law is made a criminal offense and where no express authorization by injunction is provided. (*State, ex rel., v. Basham,* 146 Kan. 181, 70 P. 2d 24.) It seems clear, however, that a statute which expressly makes available to the state the remedy of injunction for the protection of the public health, is not invalid on constitutional grounds merely because the violator of a statute is also amenable to criminal prosecution. Such a statute is not invalid as authorizing an injunction against an act made criminal or as denying the right to a jury trial in criminal prosecutions. Punishment for violation of such injunction would be for contempt of the order of injunction and not punishment for violation of a criminal statute. These principles have been clearly recognized in cases of injunction under medical practice acts and similar legislation. (*Bd. of Medical Examiners v. Blair,* 57 Utah 516, 196 Pac. 221; *State v. Smith,* 43 Ariz. 131, 29 P. 2d 718; *McMillan v. Sanitary Bd.,* 119 Miss. 500, 81 So. 169; *P. S. C. of Wyo. v. Grimshaw,* 49 Wyo. 158, 53 P. 2d 1; *Itcaina v. Marble,* 56 Nev. 420, 55 P. 2d 625; 32 C. J. Injunctions, §§ 438, 442; 5 A. L. R. 1474, Anno.)

Defendant insists he has not had his day in court. The contention is not well taken. It is based upon the refusal of the trial court

to hear the testimony of numerous witnesses. No proper showing is made concerning the nature and substance of their testimony had they been permitted to testify. The alleged error is therefore not properly presented for review. (*Walker v. S. H. Kress & Co.*, ante, pp. 48, 56, 75 P. 2d 820.) We are told the witnesses would have testified concerning the benefits derived from defendant's treatments. The question at issue was not how much benefit or harm had resulted from defendant's treatments. The question was whether he was authorized to do what he had done and what he intended to continue to do, without a license. Defendant's own admissions disclosed his practice was not within the law and the testimony of his friends could not have altered that fact.

It is also urged the trial court abused its discretion, improperly joined in the argument of counsel, made injudicial remarks and displayed prejudice against the defendant. In view of the seriousness of such charges we have not relied merely upon the abstracts, but have carefully analyzed the transcript. The record discloses the trial court exercised exceptional patience throughout the trial, asked only questions which facilitated the trial, and that he was particularly courteous to the defendant in every possible way. The complaints are utterly devoid of merit.

It is also urged the treatment of cancer should not have been enjoined because the term "cancer" is not specifically mentioned in the medical practice act. The contention scarcely merits mention. The statute did not attempt to particularize ailments or diseases which it was designed to embrace. It was intended to be and is general in its terms.

It is finally urged defendant's motion to strike the testimony of the witness, Tice, who made the investigation, should have been sustained for the reason he was acting as a decoy and that his statements were untrue. It is not contended the trial court did not carefully scrutinize and consider the testimony of the witness. The credibility of the witness and the weight of his testimony were proper subjects for the consideration of the trial court, but not for this court.

We have examined such cases as defendant has cited, but they are not authority for any contention here made.

The judgment is affirmed.