No. 22,299.

THE STATE OF KANSAS, *Appellee*, v. MRS. L. O. HEITMAN,
*Appellant*.

SYLLABUS BY THE COURT.

STATUTE—*Establishing Industrial Farm for Women—Constitutional and
Valid.* Chapter 298 of the Laws of 1917, establishing an institution
known as the state industrial farm for· women, for the detention
and care of women convicted of criminal offenses, does not violate
any of the provisions of the fourteenth amendment to the constitution
of the United States, because a woman convicted of misdemeanor is
sentenced to the farm for an undetermined period, with a maximum
limit, while a man convicted of the same misdemeanor is sentenced,
under the general law, to the county jail for a definite period, within
the same maximum limit.

Appeal from Shawnee district court, division No. 1; ROBERT
D. GARVER, judge. Opinion filed June 7, 1919. Affirmed.

*Edward Rooney*, of Topeka, for the appellant.

*Richard J. Hopkins*, attorney-general, and *Hugh T. Fisher*,
county attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant was convicted of keeping a liquor
nuisance. She was sentenced to pay a fine of $100, and was
committed to the state industrial farm for women until dis-
charged according to law. She appeals from the portion of the
judgment assessing penalty.

The statute under which the defendant was convicted is
section 1 of chapter 232 of the Laws of 1901. After declaring
what places are common nuisances, the statute provides as
follows:

"Every person who maintains or assists in maintaining such com-
mon nuisance shall be guilty of a misdemeanor, and upon conviction
shall be punished by a fine of not less than one hundred dollars nor
more than five hundred dollars, and by imprisonment in the county jail
not less than thirty days nor more than six months, for each offense."
(Gen. Stat. 1915, § 5524.)

The fine was assessed under this statute. The commitment was adjudged under the provisions of section 5 of chapter 298 of the Laws of 1917, reading as follows:

"Every female person, above the age of eighteen years, who shall be convicted of any offense against the criminal laws of this state, punishable by imprisonment, shall be sentenced to the state industrial farm for women, but the court imposing such sentence shall not fix the limit or duration of the sentence. The term of imprisonment of any person so convicted and sentenced shall be terminated by the state board of administration, as authorized by this act, but such imprisonment shall not exceed the maximum term provided by law for the crime for which the person was convicted; provided, that where the person, so convicted and sentenced to said industrial farm for women, is not more than twenty-five years of age and said conviction is for her first offense, the board of administration may parole or release such person under rules and regulations prescribed by said board before the expiration of the minimum term, but in all other cases, the person so committed to said institution shall not be eligible to parole by the board of administration until the expiration of the minimum term fixed by law for the punishment of the offense for which she has been convicted; provided further, that where any person has been committed to such institution on conviction for murder in the first or second degree, such person shall not be released from said institution until the expiration of the term for which such person is sentenced, except by action of the governor exercising his pardoning or parole power."

The detention portion of the defendant's sentence was, therefore, indeterminate, with a maximum limit of six months. If the defendant had been a man, the sentence would have been to the county jail, for some definite period within the maximum and minimum limits fixed by the statute of 1901. Because the defendant was sentenced to detention for an undetermined period at the state industrial farm for women, she contends she has been denied the equal protection of the law, and that her privileges and immunities have been abridged, contrary to the fourteenth amendment to the constitution of the United States. Some other objections to the industrial-farm law are proposed, but they have already been disposed of in the cases of *The State v. Dunkerton,* 103 Kan. 748, 175 Pac. 981, and *In re Dunkerton,* 104 Kan. 481, 179 Pac. 347.

In support of the defendant's contention, the familiar decisions are cited which declare that, in the administration of criminal justice, no different or higher punishment shall be imposed on one than that which is prescribed for all, for the

The State v. Heitman.

same offense. The reason for striving to base justice on equality is probably best stated in Rudolf von Ihering's "Law as a Means to an End," chapter VIII, section 11, translated from the German and published as volume five of the Modern Legal Philosophy Series:

"What is there so great in equality that we measure the highest concept of right—for this is what justice is—by it? Why should law strive after equality, when all nature denies it? And what value has equality independently of any particular content? Equality may be as much as anything else equality of misery. Is it a consolation for the criminal to know that the punishment which has overtaken him will also strike all others in the same position? The desire for equality seems to have its ultimate ground in an ugly trait of the human heart; in ill-will and envy. No one shall be better or less badly off than I; if I am miserable, everybody else, too, shall be so.

"But the reason we want equality in law is not because it is something worth striving after in itself, for it is not so at all. We see to it that with all the equalizing powers of the law, inequality finds its way back again by a thousand paths. But, indeed, our reason for wanting it is because it is the condition of the *welfare* of society. When the burdens which society imposes upon its members are distributed unequally, not only does that part suffer which is too heavily laden, but the whole of society. The center of gravity is displaced, the equilibrium is disturbed, and the natural consequence is a social struggle for the purpose of reëstablishing equilibrium; which under certain conditions becomes a highly dangerous menace, and is always a shock to the existing social order." (p. 276.)

Differences, however, cannot be denied or disregarded, and the very principle of equality not only approves but necessitates classification, without which fixation of the social center of gravity and stable equilibrium of the social order would be impossible. It would revolt justice if youthful first offenders were subjected to the same penal regimen as mature recidivists. Hence, the decisions are numerous and familiar that equal protection of the law is secured if the law operate in the same way on all who belong in the same class. Classes may not be created arbitrarily or unreasonably, or the principle of equality would be violated. There must be some difference in character, condition, or situation, to justify distinction, and this difference must bear a just and proper relation to the proposed classification and regulation; otherwise, the classification is forced and unreal, and greater burdens are, in fact, imposed on some than on others of the same desert. The de-

fendant asserts that sex does not constitute a just and reasonable ground for substituting an indeterminate sentence, within a stated limit, to the industrial farm for women, in place of a definite sentence, within the same limit, to the county jail.

In the years between enactment of the statutes of 1901 and 1917, application of the scientific method in dealing with the subjects of crime and punishment has produced noteworthy results. Crime is no longer treated abstractly, according to the *a priori* method, and punishment no longer consists of penalties sawed into stock lengths and corded up by the judges' bench, for use in passing sentence.

Every act condemned by our penal code is proper, perhaps laudable, somewhere in the world. Each civil society governmentally organized has a conception, more or less definite, of its own best interest and welfare, and sets up standards of conduct to which the individual is supposed to conform. Failure to measure up to the prescribed standards may be of such public concern that the state must attach sanctions to its regulations. When the state shall do this is a practical question, to be determined with respect to circumstances and conditions. Departure from the standard thus sanctioned we call crime, and the nonconformist we call a criminal.

Investigation of the facts discloses that the nonconformist generally acts through the prompting of some perfectly natural instinct, such as the pugnacious instinct, the sex instinct, or the acquisitive instinct. The state itself, by the creation or toleration of untoward conditions, may contribute to delinquency. Statistics have been published showing that, in the year 1916, in the state of Massachusetts, 176,000 arrests were made. Of these, 104,000 were for drunkenness; and, consequently, the legally recognized sale of intoxicating liquor under government license was directly responsible for crime. Conditions resulting from social and economic pressure are contributing causes of crime; but the nonconformist fails to measure up to the normal standard, primarily and principally, on account of some personal subnormality or abnormality of body or mind, or both. The result is that the study of crime, not neglecting the social factor, becomes largely the study of individuals.

The State v. Heitman.

Individuals cannot be studied *en masse*. They may be classified into groups, on the basis of common characteristics, but the individual cannot be assigned to his proper group until he has been segregated and his peculiar physical and mental endowments, or lack of endowments, have been considered in the light of his heredity and environment.

The method which has just been described must be employed in affixing punishment. Care must be taken that, in denouncing punishment, which is done in the interest of society, society itself does not suffer—for punishment is a two-edged sword. In ancient barbarous days it was discovered that it was to the advantage of the conqueror not to kill his captives; they were more profitable kept alive, fed well, well cared for, and put to work. In the same way, society now loses if it punish one of its members in a way that crushes him, when it might rehabilitate him and restore him to conformity and usefulness.

The old theory of vengeance and retribution, carried out in medieval times in torture chambers with implements of torture, and in modern times by means more degrading, if less severe, wholly failed to better social conditions. The theory of deterrence by horrible example did no better. In the reign of Henry VIII, 70,000 thieves were hung, and it was found more pockets were picked during the hangings than at any other time. For a remarkably long time our criminal and penal jurisprudence suffered from the paralysis of outgrown traditions, the application of antiquated methods, and the employment of archaic equipment. As the results of patient, careful, scientific study and experiment, sifted, compared, and corrected in conferences and congresses, national and international, became generally known, and the practical work of individual criminologists, penologists, and social reformers commenced to attract general attention, the public mind and conscience slowly awakened. State legislatures commenced to take notice. In very recent years progress has been rapid, and there are now few to deny that it is best for society—is simply common sense—to try to float from off the rocks of the penal law, and save, if possible, for future profitable voyaging, human vessels stranded there, whether by fog, or ill wind, or defective stearing gear, or bad seamanship.

Quite obviously it is of fundamental importance that the nature of the particular vessel be considered, in order that proper measures may be adopted to save it; and Mrs. Jessie D. Hodder, superintendent of the reformatory for women at Framingham, Mass., made the following classification of women sentenced to reformatories for crime: With reference to intellect, they may be imbecile, moron, subnormal, dull, fair, or good; with reference to nervous organization, they may be normal, neuropathic, psychopathic, epileptic, or hysterical. These are only some of the factors which determine whether or not a delinquent woman needs permanent custodial care, may safely be returned to society after training, or presents a special and peculiar disciplinary problem. (Proceedings National Conference of Social Work, 45th annual session [1918], page 117.)

The one unqualifiedly reprobated and repudiated punitive institution is the county jail. It has no defenders, except local officials, jealous of centralized authority, and the sheriff, elected irrespective of qualifications to rehabilitate men and women, even if he had facilities and opportunity, and whose compensation depends, in part, on fees for keeping and boarding prisoners. There is no opportunity for segregation, differentiation, and proper classification. There is no opportunity for discipline at all, much less discipline appropriate to individual need. There is nothing but detention, and detention in caged and demoralizing idleness, injurious to body and mind, crushing to the spirit, and tending to moral contamination and induration, rather than to moral upbuilding. The consensus of enlightened opinion is that the county jail is impossible as a place of punishment, and has no justification for its existence except as a place of temporary keeping, in default of bail, pending final conviction.

Another relic of the stone age of penological theory and practice is the definite sentence for a fixed period for a specific crime. It has been well said that it is just as stupid, and infinitely more cruel, to sentence misdemeanants to jail for fixed periods, as it would be to sentence sick people to a hospital for fixed periods. All penologists agree that the definite sentence should be abolished, because, if the primary object be to return to society as future assets those who are present liabilities, there must be classification, and there must be time, according

to susceptibility and capability, for the remedial, reformatory, and educational processes to have their effect. In a given case, the period of detention may be quite short; but, according to need, the brain must be cooled; the nerves nourished and quieted; the clouded or deadened conscience cleared or quickened; the weakened will strengthened; the disordered mind. with its confused notions of right and morality, stabilized; and fresh impulses given, outward, away from the old self, forward, to new and hopeful things, and upward, to self-respect and self-control.

Comprehension of the fact that punishment ought to fit, in some degree, not simply the crime, but the offender, led the legislature to adopt the system of maximum and minimum penalties found in the crimes act and related statutes. Clearer comprehension led it to adopt, in recent years, the indeterminate sentence for felonies, except murder and treason (1903), and the parole system (1907).

Experience teaches that the greatest evil of prison life is idleness, and that the greatest benefaction which can be conferred on a prisoner is work adapted to his abilities and performed under clever plan and guidance. Work is indispensable to order and discipline, to physical and mental health, and to growth in moral strength and stature. Work should not be merely useless or formal, but should be at something capable of arousing interest and generating the feeling that what is done is worth while. There should even be some division of the profit from labor between the workman and his employer, the state. The best results are attained when work is performed in an environment as nearly as possible natural and normal, and the results of work done in the sunshine and wind and free air of the open outdoors, away from barred cells and frowning, guard-mounted walls, have been most gratifying. Some of the states are able to present records of success attending this method of treatment which, contrasted with old prison policies, are quite marvelous.

The circumstance that the new method of dealing with convicts happens to be more humanitarian than the old does not detract from its virtue. It has been adopted after trial, not from sentiment, but because of its demonstrated efficiency in protecting and promoting the true and ultimate welfare of society as a whole.

10—105 KAN.

Long ago the legislature made the first and most obvious classification of delinquents, and provided for segregation of youthful offenders, and treatment of boys and girls in separate corrective institutions. By enactment of the industrial-farm statute, the legislature made the next most obvious classification, based on the distinction between male and female, and abolished the county jail and the penitentiary as places for the reformatory treatment of women.

The industrial-farm law puts into practice the most advanced tenets of the new penology. The farm is under supervision of the state board of administration, the central body having control of all correctional, charitable, and educational institutions of the state. The superintendent is a woman. The farm is in fact a farm, and the buildings are constructed on the cottage plan. Provision is made against overcrowding, and there are no cells or bars or restraining walls. Careful classifications are made, according to the results of searching physical, mental, and moral diagnoses, and complete records are kept of all facts throwing light on cause of detention, proper plan of treatment, and progress of the individual. Medical and surgical treatment is administered. The discipline is educative and reformative, and the work includes agriculture, dairying, poultry raising, manufacturing, and practice of domestic arts and sciences. Small wages are allowed, and provision is made for parole and final discharge whenever compatible with the welfare of society, with full restoration of all civil rights.

It required no anatomist, or physiologist, or psychologist, or psychiatrist, to tell the legislature that women are different from men. In structure and function, human beings are still as they were in the beginning—"Male and female created He them." It is a patent and deep-lying fact that these fundamental anatomical and physiological differences affect the whole psychic organization. They create the differences in personality between men and women, and personality is the predominating factor in delinquent careers. It was inevitable that, in the ages during which woman has been bearer of the race, her unique and absolutely personal experiences, from the time of conception to the time when developed offspring attains maturity, should react on personality, and produce what we un-

derstand to be embraced by the term womanhood.  Woman enters spheres of sensation, perception, emotion, desire, knowl- edge, and experience, of an intensity and of a kind which man cannot know.  Her individualities and peculiarities are fos- tered by education and by social custom—whether false and artificial or not is of no consequence here—and the result is a feminine type radically different from the masculine type, which demands special consideration in the study and treat- ment of nonconformity to law.

It is not worth while discussing the necessity of preventing promiscuous association of the sexes in prison.  There must be complete segregation.  Female wards in men's prisons, and female annexes to men's prisons, merely separate the sexes. They do not differentiate the problem of the delinquent female from the problem of the delinquent male.  In 1869 the legis- lature of the state of Indiana undertook to do this, by estab- lishing a separate prison for women, to be officered and man- aged by women, and conducted according to the reformatory method as then apprehended.  Since 1869 some thirteen other states have established separate institutions for the treat- ment of delinquent women, on the definite principle of reclama- tion as opposed to naked punishment.  The industrial farm, with buildings constructed on the cottage plan, has become an accepted type, and the indeterminate sentence has been almost, though not quite, universally adopted.  An extended analysis of the statutes in existence prior to January 1, 1917—which therefore does not include the later statutes of Connecticut, Kansas, Michigan, and Rhode Island—may be found in volume 8 of the Journal of Criminal Law and Criminology, at page 518.

Many facts might be marshaled leading to the conclusion that the female offender not merely requires, but deserves, on account of matters touching the perpetuation and virility of the human species, correctional treatment different from the male offender, both in kind and in degree; but the general con- siderations, merely outlined above, are sufficient.  Let it be conceded that the industrial farm for women may fail to ac- complish the results hoped for: the statute represents a seri- ous effort on the part of the legislature to deal justly with a subject of great public concern; the proposed regulations are justified by reasoning apparently sound, supported by experi-

ence apparently verifying; and this court is not authorized to declare that the classification which the statute establishes is either arbitrary or unreasonable.

The judgment of the district court is affirmed.