No. 34,210

The State of Kansas, *Appellee*, v. J. H. Jones and Hazel I. Jones, *Appellants*.

(89 P. 2d 878)

Opinion filed May 6, 1939.

*Elisha Scott,* of Topeka, for the appellants.

*Jay S. Parker,* attorney general, *A. B. Mitchell,* assistant attorney general, *Glenn Jones,* county attorney, and *Hal Hyler,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action to enjoin the commission of a liquor nuisance. Judgment was for the plaintiff. The particular matter with which we are concerned is an order committing one of the defendants to the Kansas industrial farm for women at Lansing for six months.

The facts are as follows: During December, 1935, this action was commenced against J. H. Jones. A temporary injunction was issued on December 11, 1935. On April 7, 1936, this injunction was made permanent. The portion of the injunction order with which we are interested was as follows:

"It is, therefore, by the court considered, ordered, adjudged and decreed, That the temporary injunction heretofore granted be and the same is hereby made permanent and perpetual, and that said defendant be and he is hereby forever restrained from keeping, maintaining or operating, or permitting to be kept, maintained or operated, in or upon the premises described in the petition herein and the buildings situated thereon and appurtenant thereto, or any other place in Labette county, Kansas, a place where intoxicating liquors are or shall be sold, bartered or given away in violation of law, or where persons are or shall be permitted to resort for the purpose of drinking intoxicating liquors as a beverage, or where intoxicating liquors are or shall be kept for sale, barter or delivery in violation of the law, and from selling, bartering or giving away, or permitting to be sold, bartered or given away, intoxicating liquors on said premises in violation of law; and all persons are hereby enjoined and restrained from entering into or congregating upon said premises for the purpose of drinking intoxicating liquors as a beverage, or from placing or in any manner assisting in placing, intoxicating liquors on said premises to be used in violation of law, and that the defendant pay the costs of this prosecution, of which shall include the sum of fifty dollars ($50), as a fee for the county attorney."

On July 14, 1937, the county attorney filed an affidavit against Hazel I. Jones in which he set out the granting of the temporary and permanent injunction, and stated further that notwithstanding these injunctions Hazel Jones had refused to obey it; that she, on December 11, 1935, and on April 7, 1936, and at the time of the filing of the affidavit, was the wife of J. H. Jones; that she was living with J. H. Jones at the property in question on the date when the injunction order was issued and was still living there when the affidavit was made; that on or about July 11, 1938, and prior to that time Hazel I. Jones was maintaining a place at the location in question, where persons were permitted to resort for the purpose of drinking intoxicating liquors as a beverage, and where intoxicating liquors were kept for sale, barter and delivery, in violation of law.

Upon the filing of this affidavit the trial court issued an order directing the sheriff to attach the body of Hazel I. Jones and bring her before the court to be then and there proceeded against for indirect contempt of court for having violated the injunction mentioned. The defendant, Hazel I. Jones, had notice of the writ and voluntarily came before the court. The county attorney then filed

an accusation in contempt in substantially the same language as the affidavit to which reference has already been made. The trial occurred on that accusation. There was no dispute about the issuance of the temporary and permanent injunction and that defendant in this proceeding was the wife of J. H. Jones when the injunction was granted, had been his wife at all times since, and had lived in the house against which the injunction was granted at all times. There was ample evidence to sustain the trial court's finding that on July 4, 1938, Hazel was guilty of indirect contempt of court for having violated the terms of the permanent injunction. The trial court did so find, and ordered that she pay a fine of $250, and that she be confined in the Kansas state industrial farm for women until discharged, as provided by law, not to exceed six months. A motion for a new trial was made and overruled, and defendant Hazel Jones appeals.

The first argument made by defendant is that the order making her a defendant in this case was void. Presumably by that is meant the order of attachment. Defendant argues that she had no actual notice or personal knowledge of any injunction against the premises involved here. This court considered such an argument in *State v. Richardson,* 128 Kan. 627, 278 Pac. 752. There the proceedings were to abate the nuisance rather than to punish for contempt. The original party against whom the injunction had been granted had died before the proceedings to abate had been begun. This court said:

"An injunction forbidding the maintenance of a liquor nuisance on premises is a restriction, in the nature of an encumbrance upon the use of the property, and runs with the land or tenement and binds everybody then or thereafter concerned therewith." (p. 631.)

(See *State v. Porter,* 76 Kan. 411, 91 Pac. 1073.)

There is substantial evidence in this record that defendant Hazel Jones knew that the permanent injunction was issued, and had been in the liquor business in partnership with her husband or on her own account at all times from the time when the injunction was issued up to the institution of the contempt proceedings.

Defendant next argues that the court erred in sentencing her to the Kansas state industrial farm for women. The argument is that a woman can only be sentenced to that institution when she has been convicted of an offense against the criminal laws of the state and that indirect contempt of court is not such an offense.

The statute establishing the state industrial farm for women is G. S. 1935, 76-2501. It provides as follows:

"There is hereby established an institution for the detention and care of women convicted of criminal offenses, which shall be conducted by and be under the general supervision, charge and superintendency of the state board of administration. Such institution shall be known as 'The state industrial farm for women.'"

The next section in which we are interested is G. S. 1935, 76-2505. That section is as follows:

"Every female person above the age of eighteen years, who shall be convicted of any offense against the criminal laws of this state, punishable by imprisonment, shall be sentenced to the state industrial farm for women, but the court imposing such sentence shall not fix the limit or duration of the sentence. The term of imprisonment of any person so convicted and sentenced shall be terminated by the state board of administration, as authorized by this act, but such imprisonment shall not exceed the maximum term provided by law for the crime for which the person was convicted: *Provided,* That where the person, so convicted and sentenced to said industrial farm for women, is not more than twenty-five years of age and said conviction is for her first offense, the board of administration may parole or release such person under rules and regulations prescribed by said board before the expiration of the minimum term, but in all other cases, the person so committed to said institution shall not be eligible to parole by the board of administration until the expiration of the minimum term fixed by law for the punishment of the offense for which she has been convicted: *Provided further,* That where any person has been committed to such institution on conviction for murder in the first or second degree, such person shall not be released from said institution until the expiration of the term for which such person is sentenced, except by action of the governor exercising his pardoning or parole power."

It will be noted that the section establishing the institution refers to "the detention and care of women convicted of criminal offenses."

The next section quoted refers to female persons "who shall be convicted of any offense against the criminal laws of this state." Our question then is whether the disobedience of a liquor injunction is a criminal offense within the meaning of the above statutes.

Shortly after this institution was established various attacks were leveled at it. (See *In re Dunkerton,* 104 Kan. 481, 179 Pac. 347.) In that case a woman had been sentenced to the farm for violation of the bone-dry law. She contended that the sentence was illegal because a woman sentenced to this institution was denied some rights that a man sentenced to jail for the same offense would have. In treating this contention this court said:

"The purpose of the act of 1917 is to ameliorate the condition of women who have been convicted of an offense punishable by imprisonment. Under the act women are not subjected to the debauching influence of the county jail and of the penitentiary and of the close confinement therein, but are placed in a field where labor is pleasant and restraint is limited, and where the evil influence of other persons convicted of crime is minimized. The act seeks to improve, to educate, and to build up; not to punish." (p. 483.)

See, also, *State v. Heitman*, 105 Kan. 139, 181 Pac. 630. In that case a woman had been sentenced to the farm after she had been convicted of maintaining a liquor nuisance. This court affirmed the judgment and said:

"Many facts might be marshaled leading to the conclusion that the female offender not merely requires, but deserves, on account of matters touching the perpetuation and virility of the human species, correctional treatment different from the male offender, both in kind and in degree; but the general considerations, merely outlined above, are sufficient. Let it be conceded that the industrial farm for women may fail to accomplish the results hoped for; the statute represents a serious effort on the part of the legislature to deal justly with a subject of great public concern; the proposed regulations are justified by reasoning apparently sound, supported by experience apparently verifying; and this court is not authorized to declare that the classification which the statute establishes is either arbitrary or unreasonable." (p. 147.)

From a consideration of these authorities we have reached the conclusion that the legislature has adopted a policy that women shall be confined in the state industrial farm for women and at no other place.

Defendant argues that notwithstanding this the legislature has failed to provide any place where a woman can be confined for violating a liquor injunction.

At the outset it should be noted that the defendant here has been found guilty of doing an act which has been characterized by our legislature as a crime, that is, she has been found guilty of maintaining a place where people come for the purpose of drinking intoxicating liquor. The only difference between her case and that of defendants in *State v. Heitman* and *In re Dunkerton*, is that in those cases the defendants had been tried before a jury, and in this case the trial was before the court without a jury.

The statute pursuant to which this action was brought is G. S. 1935, 21-2130 and 21-2131, also 21-2132. G. S. 1935, 21-2131, provides for the bringing of the action and that any person violating the injunction order may be punished for contempt by a fine of not less than $100 nor more than $500 and by imprisonment in the county

jail not less than thirty days nor more than six months. This is the same punishment that is provided for the offense of maintaining a liquor nuisance, as defined by the preceding sections, and to which the section we are considering refers.

There is no contention here that the statute providing for an injunction to forbid the maintaining of a liquor nuisance is invalid or that the injunction in this case should not have been granted. Hence the only question with which we are concerned revolves around the contempt proceedings.

It is well settled that contempt proceedings may be considered in two classifications—criminal and civil contempts. In *State v. Rose*, 78 Kan. 600, 97 Pac. 788, Rose was fined by this court for contempt of an order of ouster issued by it. His contemptuous acts were committed in Wyandotte county. The question arose as to what county was entitled to the money paid as a fine. It was paid to the clerk of this court at his office in Shawnee county. The court cited section 332 of the code of criminal procedure, being G. S. 1935, 62-1908, which reads as follows:

"All fines and penalties imposed and all forfeitures incurred in any county shall be paid into the treasury thereof, to be applied to the support of the common schools."

And held that pursuant to that statute the fine should be treated as a "penalty incurred in Wyandotte county" and paid to the treasurer of that county for the support of the common schools there. This court said:

"The words 'fine,' 'penalty' and 'forfeiture' sometimes have technical and restricted significations, and at other times overlap and run together in meaning. When one of them is used in a statute or constitution the true intent must be ascertained according to the ordinary methods of interpretation. The same is true of the words 'penal laws' found in the constitutional provision quoted.

"It is not necessary that fines for contempts of this court should have been specifically in the minds of the authors of either the constitution or the statute. The designation of a class includes everything properly belonging to the class. Jurisdiction to administer punishment by way of fines for contempts inheres as a common-law attribute in the grant of judicial power to the court. The law upon the subject of contempt is well defined and well understood, and its penal character cannot plausibly be questioned. Indeed, proceedings in contempt, except in certain special cases, were criminal under the common law (Rapalje, Cont. 25; Oswald Cont., Com. & Att., 2d ed. 99, 199), and this common-law quality of criminality continues to characterize them to such an extent that general provisions of the code of criminal procedure are frequently applied to them. (*The State v. Dent*, 29 Kan. 416; *In re Simms*, 54 Kan. 1, 4, 37 Pac. 135; 25 L. R. A. 110, 45 Am. St. Rep. 261, and cases there cited.) Therefore, there

can be no doubt that the money in controversy represents the proceeds of a fine, imposed for a breach of the penal law."

Thus, it appears that this court construed the words "penalties," "fines" and "forfeitures" to be applicable to a contempt proceeding.

In *State, ex rel., v. Miller,* 147 Kan. 242, 75 P. 2d 239, the defendant had been enjoined from maintaining a liquor nuisance and had been tried for contempt and sentenced to the Kansas industrial farm for women. She appealed. The state asked that her appeal be dismissed because she had not complied with the statute providing for appeals in criminal actions. This court held that the action was a criminal one and dismissed the appeal. This court said:

"The contempt of which appellant was found guilty was of an order made, not to protect any private right, but to preserve the peace and dignity of the state, to prevent a continuance of a liquor nuisance and to enforce the criminal laws of this state, and that it was treated as a criminal and not a civil proceeding may be inferred from the fact that a jury was waived. Whatever might be said in a borderline case, there can be no doubt that the contempt of which appellant was found guilty was a criminal contempt. If she wished to appeal from the conviction, she should have complied with the statutes governing appeals in criminal cases." (p. 244.)

This court also quoted with approval from *In re Nevitt,* 117 Fed. 448:

"Proceedings for contempts are of two classes—those prosecuted to preserve the power and vindicate the dignity of the courts, and to punish for disobedience of their orders, and those instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled. The former are criminal and punitive in their nature, and the government, the courts, and the people are interested in their prosecution. The latter are civil, remedial, and coercive in their nature, and the parties chiefly in interest in their conduct and prosecution are the individuals whose private rights and remedies they were instituted to protect or enforce." (p. 458.)

In consideration of this argument we are persuaded somewhat by the fact that G. S. 1935, 21-2131, used the words "punished," "violating," "fine" and "imprisonment." All these are words which are ordinarily used when dealing with criminal matters. It must be borne in mind that ever since the decision in *State v. Cutler,* 13 Kan. 131, contempt proceedings, while they had some of the attributes of criminal proceedings, have never been regarded as criminal insofar as the defendant had a right to a trial by jury. (See, also, *State, ex rel., v. Cooper,* 147 Kan. 710, 78 P. 2d 884.)

In this connection it should be noted that G. S. 1935, 20-1204, provides the procedure in trials for indirect contempt. Among other provisions is the following:

"If the accused answer, the trial shall proceed upon testimony produced as in criminal cases, and the accused shall be entitled to be confronted with the witnesses against him; but such trial shall be by the court or judge. If the accused be found guilty, judgment shall be entered accordingly, prescribing the punishment."

The legislature has evidently considered indirect contempt of court as a proceeding that has many of the elements of a criminal prosecution.

In construing a statute courts should not give a narrow or technical meaning to words when to do so will have the effect of nullifying the intent of the legislature. It was clearly the intent here that when it became necessary to confine a woman for an offense, her confinement should be at the Kansas industrial farm for women, and nowhere else. This state followed a policy of using the injunction and contempt proceedings as one of the means of enforcing the prohibitory law for many years before the farm for women was established. To say that the statute establishing this farm did not contemplate the use of the farm as a place of confinement for women who were guilty of contempt of court would mean that women in such cases should be committed to the county jail, because if G. S. 1935, 76-2501 and 76-2505, do not save them from such confinement then no other statute does. That would mean that women found guilty of such acts would be deprived of the beneficial influence of that institution. No reason appears why the legislature had any such intent. We hold that the sentence of the trial court was correct.

The holding of this court in *In re Hurston*, 112 Kan. 238, 210 Pac. 495, is urged as an authority for the position taken by the defendant here. In that case the defendant was a woman who had been convicted of a violation of the city ordinance. All this court held was that a violation of a city ordinance was not a violation of the criminal laws of the state and that such a defendant could not be sentenced to the farm.

In *State, ex rel., v. Gibson*, 138 Kan. 457, 26 P. 2d 284, the defendant, a woman, had been fined on a charge of assault and battery and was ordered committed to the county jail until the fine and costs were paid. This court held that this was not an offense which required that defendant be committed to the farm for women. The decision

turned on the point that the offense of which she had been convicted was not punishable by imprisonment.

Defendant argues that the court erred in admitting evidence as to the reputation of the place. This evidence was competent. (See *State v. Brooks*, 74 Kan. 175, 85 Pac. 1013.)

The judgment of the trial court is affirmed.