223 Kan. 610 (1978)
576 P.2d 221
STATE OF KANSAS, ex rel. CURT T. SCHNEIDER, ATTORNEY GENERAL, Petitioner-Appellee, KANSAS HOSPITAL ASSOCIATION, THE KANSAS MEDICAL SOCIETY, THE KANSAS HEALTH CARE PROVIDER INSURANCE AVAILABILITY PLAN, Intervenors-Appellees,
v.
BYRON TIMOTHY LIGGETT, M.D., Respondent-Appellant.
No. 49,446
Supreme Court of Kansas.
Opinion filed March 10, 1978.
Michael S. Holland, of Holland & Rupe, of Russell, argued the cause and was on the brief for the appellant.
Donald R. Hoffman, assistant attorney general, argued the cause and Curt T. Schneider, attorney general, was with him on the brief for the petitioner-appellee.
Wayne T. Stratton, of Goodell, Cogswell, Stratton, Edmonds, Palmer & Wright, argued the cause and Charles R. Hay, of the same firm, and Jerry M. Ward, of Ward & Berscheidt, of Great Bend, were with him on the brief for the Kansas Hospital Association and the Kansas Medical Society, intervenors-appellees.
L.M. Cornish, Jr., of Glenn, Cornish & Leuenberger, of Topeka, argued the cause and was on the brief for the Kansas Health Care Provider Insurance Availability Plan, intervenor-appellee.
The opinion of the court was delivered by
OWSLEY, J.:
This is an appeal from an action wherein Dr. Byron Timothy Liggett was enjoined from practicing medicine until he obtained medical malpractice insurance as required by K.S.A. 1976 Supp. 40-3401, et seq. (now K.S.A. 1977 Supp. 40-3401, et *611 seq.). The doctor challenges the constitutionality of the act on the grounds it denies him (1) substantive due process of the law, and (2) equal protection of the law. For the reasons set forth herein we find the act constitutional.
The Kansas Health Care Provider Insurance Availability Act was passed by the 1976 legislature as a partial response to increasing pressure brought upon Kansas health care providers because of the national medical malpractice crisis. The primary feature of the act is the requirement that all health care providers operating within the state must obtain professional malpractice liability insurance (40-3402) and pay a surcharge to the health care stabilization fund (40-3404). The law requires the provider to carry a basic policy of $100,000 per occurrence and an annual aggregate of $300,000 for all claims made during the period. The stabilization fund provides for the payment of claims in excess of policy limits. Included in the act is a provision requiring every health care insurer to participate in an apportionment plan whereby any health care provider may obtain liability insurance from the plan if insurance from a conventional source (40-3413) is not available.
The problem of obtaining and maintaining affordable malpractice insurance came before the legislature in 1971, 1973 and 1975. As a result, the legislature enacted a law in 1975 requiring all health care insurers to report their claims experience to the commissioner of insurance (K.S.A. 1975 Supp. 40-1126, et seq.). In 1976, however, the problem had grown to such proportions it received full legislative attention. A legislative interim committee was told in detail how insurance costs had skyrocketed on present policies, policies were unavailable for new doctors, insurers were beginning to withdraw from the medical malpractice field, and the availability of medical service in some Kansas communities was threatened. In response, the committee proposed twelve bills, including the act in the present controversy.
The original bill did not require mandatory insurance coverage, nor did it require payment of the surcharge. These provisions were added by the legislature at the behest of Insurance Commissioner Fletcher Bell. The mandatory coverage provision, it was alleged, would provide for the financial stability of the insurance availability program and would assure all Kansans they would have a source of recovery for damages resulting from malpractice.
*612 During the hearings on the bill Kansas dentists and nurses asked to be exempted from the proposed legislation. Both groups testified they were not experiencing the problems of malpractice associated with other health care providers and they could obtain adequate amounts of low cost insurance from their national associations. It was stated that many nurses worked on a part-time basis and the proposed mandatory insurance requirement, if applied to them, would economically force them out of practice.
Pharmacists, originally exempted from the act, asked to be included because they were beginning to experience malpractice and insurance availability problems similar to doctors and hospitals. The legislature made the insurance coverage mandatory and included pharmacists but exempted dentists and nurses.
The main thrust of Dr. Liggett's attack on the act is that it requires him to obtain liability insurance before he may engage in the practice of medicine. He argues he was already qualified and licensed to practice medicine prior to the time the law went into effect; therefore, he has a vested right to practice medicine and the state cannot now impose any additional requirements which might take away that right. He further argues that any requirement affecting the right to practice a profession must be directly related to a person's ability to practice that profession before the condition is constitutionally valid. He also claims, and the state candidly admits, that the presence or absence of insurance does not affect his competence as a physician; it affects only the ability to satisfy a judgment if he should successfully be sued for negligence or malpractice.
In all fairness to Dr. Liggett it should be noted that no one has alleged he is incompetent or unfit to practice medicine, and to our knowledge he has not been sued for malpractice, nor have any complaints been lodged against him. He simply refuses to purchase the required insurance or to pay the surcharge.
We live in a dynamic society and the law must change responsively to the needs of the people. No person has a vested right in any rule of law entitling him to insist it shall remain unchanged for his benefit. (New York Central R.R. Co. v. White, 243 U.S. 188, 61 L.Ed. 667, 37 S.Ct. 247.) Events transpiring after the passage of a law may require changes and place a citizen in a position different from that which he occupied prior to the change. (Pinnick *613 v. Cleary, 360 Mass. 1, 271 N.E.2d 592 [1971], 42 A.L.R.3d 194.) The Fourteenth Amendment to the United States Constitution and Section 18 of the Kansas Bill of Rights do not constitutionally prohibit changes in the law which affect a person's rights as they existed at common law. In Williams v. City of Wichita, 190 Kan. 317, 374 P.2d 578, we said:
"... [T]he great office of statutes is to remedy defects in the common law as they are developed and to adapt it to the changes of time and circumstances. That the legislature may change the principle of the common law and abrogate decisions made thereunder when in its opinion it is necessary to the public interest is well settled...." (pp. 331-32.)
In Manzanares v. Bell, 214 Kan. 589, 522 P.2d 1291, considering the mandatory no-fault insurance law for Kansas motorists, this court stated:
"While Section 18 of the Bill of Rights provides a broad field for the protection of persons, property and reputation, the vested rights contained therein are subject to change by legislative power, where the change is reasonably necessary in the public interest to promote the general welfare of the people of the state. We have never held one to have a vested right in the common-law rules governing negligence actions so as to preclude substituting a viable statutory remedy for common law causes of action...." (p. 599.)
Defendant's constitutional rights are not violated merely because the statutes require him to do something which was not required of him when he first obtained his license to practice medicine.
We turn to the due process and equal protection arguments raised by defendant. In order to properly resolve these issues it is necessary to understand the distinction between these two constitutional concepts. In Ross v. Moffitt, 417 U.S. 600, 41 L.Ed.2d 341, 94 S.Ct. 2437, the court explained:
"... `Due process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated. `Equal protection,' on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable...." (p. 609.)
The standard of review in a due process case has fluctuated in response to society's changing attitudes concerning the proper role of the judiciary in the examination of social and economic regulations imposed pursuant to the state's police power. In the past courts often struck down laws with which they disagreed on the basis that due process was violated. (See, e.g., Tyson & *614 Brother v. Banton, 273 U.S. 418, 71 L.Ed. 718, 47 S.Ct. 426; Adkins v. Children's Hospital, 261 U.S. 525, 67 L.Ed. 785, 43 S.Ct. 394; Coppage v. Kansas, 236 U.S. 1, 59 L.Ed. 441, 35 S.Ct. 240; Adair v. United States, 208 U.S. 161, 52 L.Ed. 436, 28 S.Ct. 277; Lochner v. New York, 198 U.S. 45, 49 L.Ed. 937, 25 S.Ct. 539.) This practice fell into disrepute, however, beginning with the case of Nebbia v. New York, 291 U.S. 502, 78 L.Ed. 940, 54 S.Ct. 505. There the court retreated from its previous attitude and declared the test for due process to be whether the legislative means selected had a real and substantial relation to the objective sought. The rule has been restated in terms of whether the regulation is reasonable in relation to its subject and is adopted in the interest of the community. (West Coast Hotel Co. v. Parrish, 300 U.S. 379, 81 L.Ed. 703, 57 S.Ct. 578, 108 A.L.R. 1330.) Courts can no longer sit as a "super legislature" and throw out laws they feel may be unwise, improvident or inappropriate. (Ferguson v. Skrupa, 372 U.S. 726, 10 L.Ed.2d 93, 83 S.Ct. 1028, 95 A.L.R.2d 1347; Williamson v. Lee Optical Co., 348 U.S. 483, 99 L.Ed. 563, 75 S.Ct. 461.) That view remains valid today. (See, North Dakota Pharmacy Bd. v. Snyder's Stores, 414 U.S. 156, 38 L.Ed.2d 379, 94 S.Ct. 407; Dean v. Gadsden Times Publishing Corp., 412 U.S. 543, 37 L.Ed.2d 137, 93 S.Ct. 2264; Griswold v. Connecticut, 381 U.S. 479, 14 L.Ed.2d 510, 85 S.Ct. 1678.)
Defendant argues the "reasonable relation" test limits the restrictions on his right to practice medicine to those directly related to his fitness to practice medicine. In support of his position he cites Konigsberg v. State Bar, 366 U.S. 36, 6 L.Ed.2d 105, 81 S.Ct. 997, reh. denied 368 U.S. 869, 7 L.Ed.2d 69, 82 S.Ct. 21; Konigsberg v. State Bar, 353 U.S. 252, 1 L.Ed.2d 810, 77 S.Ct. 722, reh. denied 354 U.S. 927, 1 L.Ed.2d 1441, 77 S.Ct. 1374; Schware v. Board of Bar Examiners, 353 U.S. 232, 1 L.Ed.2d 796, 77 S.Ct. 752, 64 A.L.R.2d 288; Douglas v. Noble, 261 U.S. 165, 67 L.Ed. 590, 43 S.Ct. 303; and Dent v. West Virginia, 129 U.S. 114, 32 L.Ed. 623, 9 S.Ct. 231. Those decisions all involved constitutional challenges to restrictions imposed by states upon a person's ability to obtain a professional license. While they appear to limit requirements for obtaining a license to professional fitness we do not read the cases as placing only professional fitness as the basis of the right of a state to regulate professions. Down through the years federal courts have recognized that states possess an inherent *615 power to regulate certain businesses and professions for the good of society. This "police power," as the term has become known, gives states the right to act to protect and promote public health, safety, morals, peace, quiet, and law and order. (Berman v. Parker, 348 U.S. 26, 99 L.Ed. 27, 75 S.Ct. 98.) The foregoing discussion illustrates the scope of the power, but does not set its limits. (See, Noble State Bank v. Haskell, 219 U.S. 104, 111, 55 L.Ed. 112, 116, 31 S.Ct. 186.)
In Manzanares v. Bell, supra, this court recognized that the police power includes not only the right to prevent accident and injury to members of the public but the right to provide for them a method of compensation for bodily injury arising out of an accident. In support of its position the court cited Pinnick v. Cleary, supra. Upholding the Massachusetts no-fault insurance law, that court stated:
"... Any doubts as to the power of the Legislature to require the citizen, for the good of the public as a whole, to take measures for his own benefit have long since been settled in a series of cases sustaining such statutes. The fact that in many of these cases this feature of the act was not even attacked indicates the lack of gravity of the objection...." (p. 24.)
The power to require physicians and other health care providers to obtain licenses before practicing medicine is undisputed. (See, Kansas State Board of Healing Arts v. Seasholtz, 210 Kan. 694, 504 P.2d 576; Kansas State Board of Healing Arts v. Foote, 200 Kan. 447, 436 P.2d 828, 28 A.L.R.3d 472; State, ex rel., v. Gleason, 148 Kan. 1, 79 P.2d 911; State, ex rel., v. Cooper, 147 Kan. 710, 78 P.2d 884; Meffert v. Medical Board, 66 Kan. 710, 72 Pac. 247, aff'd 195 U.S. 625, 49 L.Ed. 350, 25 S.Ct. 790; State v. Wilcox, 64 Kan. 789, 68 Pac. 634; State v. Creditor, 44 Kan. 565, 24 Pac. 346.) Requiring liability insurance in order to obtain or keep such a license is not unlike requirements imposed upon abstracters (K.S.A. 1977 Supp. 58-2802), pesticide businesses (K.S.A. 1977 Supp. 2-2448), county ambulance services (K.S.A. 19-261), securities dealers (K.S.A. 17-1254), warehousemen (K.S.A. 34-229 and 34-236), livestock markets (K.S.A. 47-1002), or public carriers (K.S.A. 1977 Supp. 66-1,128 and 66-1314). The attacks made upon the mandatory insurance requirement for public carriers have withstood the same attack now made by defendant. (See, Flowers v. Fidelity & Casualty Co., 156 F.2d 586 [10th Cir.1946]; Continental Baking Co. v. Woodring, 55 *616 F.2d 347 [D. Kan. 1931], aff'd 286 U.S. 352, 76 L.Ed. 1155, 52 S.Ct. 595; Louis v. Boynton, 53 F.2d 471 [D. Kan. 1931].)
In balancing relevant and conflicting factors, as we are required to do (Bartkus v. Illinois, 359 U.S. 121, 128, 3 L.Ed.2d 684, 689, 79 S.Ct. 676, reh. denied 360 U.S. 907, 3 L.Ed.2d 1258, 79 S.Ct. 1283), we hold that the mandatory provisions of K.S.A. 1977 Supp. 40-3401, et seq., do not violate the due process clause. Mandatory malpractice insurance bears a rational relationship to the health and welfare of the citizens of this state by not only providing protection to patients who may be injured as a result of medical malpractice, but by assuring that there continues to exist in the state an adequate supply of health care providers. (See, Jones v. State Board of Medicine, 97 Idaho 859, 555 P.2d 399 [1976], cert. denied 431 U.S. 914, 53 L.Ed.2d 223, 97 S.Ct. 2173; Cf., Pollock v. Methodist Hospital, 392 F. Supp. 393 [E.D. La. 1975].)
Our next concern is whether the statute offends the equal protection clause. When considering this question we must first determine the proper test. Traditionally, the yardstick for measuring equal protection arguments has been the "reasonable basis" test. The standard was set forth in McGowan v. Maryland, 366 U.S. 420, 425-26, 6 L.Ed.2d 393, 81 S.Ct. 1101:
"... The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it...."
In Dandridge v. Williams, 397 U.S. 471, 25 L.Ed.2d 491, 90 S.Ct. 1153, reh. denied 398 U.S. 914, 26 L.Ed.2d 80, 90 S.Ct. 1684, it was stated:
"... If the classification has some `reasonable basis,' it does not offend the Constitution simply because the classification `is not made with mathematical nicety or because in practice it results in some inequality.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78...." (p. 485.)
A statute comes before the court cloaked in a presumption of constitutionality and it is the duty of the one attacking the statute to sustain the burden of proof. (Henry v. Bauder, 213 Kan. 751, 753, 518 P.2d 362; Tri-State Hotel Co. v. Londerholm, 195 Kan. 748, 760, 408 P.2d 877; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78-79, 55 L.Ed. 369, 31 S.Ct. 337.)
*617 A more stringent test has emerged, however, in cases involving "suspect classifications" or "fundamental interests." Here the courts peel away the protective presumption of constitutionality and adopt an attitude of active and critical analysis, subjecting the classification to strict scrutiny. The burden of proof to justify the classification falls upon the state. (See, Shapiro v. Thompson, 394 U.S. 618, 22 L.Ed.2d 600, 89 S.Ct. 1322.) This test has been used to strike down classifications based on race (Loving v. Virginia, 388 U.S. 1, 18 L.Ed.2d 1010, 87 S.Ct. 1817); sex (Reed v. Reed, 404 U.S. 71, 30 L.Ed.2d 225, 92 S.Ct. 251); ethnic background (Katzenbach v. Morgan, 384 U.S. 641, 16 L.Ed.2d 828, 86 S.Ct. 1717); residency (Shapiro v. Thompson, supra); alienage (Sugarman v. Dougall, 413 U.S. 634, 37 L.Ed.2d 853, 93 S.Ct. 2842; Graham v. Richardson, 403 U.S. 365, 29 L.Ed.2d 534, 91 S.Ct. 1848); and infringements of fundamental rights, such as the right to travel freely (Dunn v. Blumstein, 405 U.S. 330, 31 L.Ed.2d 274, 92 S.Ct. 995; Aptheker v. Secretary of State, 378 U.S. 500, 12 L.Ed.2d 992, 84 S.Ct. 1659) or to practice one's religion (Sherbert v. Verner, 374 U.S. 398, 10 L.Ed.2d 965, 83 S.Ct. 1790).
The "compelling state interest" or "strict scrutiny" test requires the court to consider the nature of the rights affected by the legislation, the classification established, and the governmental interest necessitating the classification. (Manzanares v. Bell, supra at 600; Memorial Hospital v. Maricopa County, 415 U.S. 250, 39 L.Ed.2d 306, 94 S.Ct. 1076; Kramer v. Union School District, 395 U.S. 621, 23 L.Ed.2d 583, 89 S.Ct. 1886.) In San Antonio School District v. Rodriguez, 411 U.S. 1, 36 L.Ed.2d 16, 93 S.Ct. 1278, reh. denied 411 U.S. 959, 36 L.Ed.2d 418, 93 S.Ct. 1919, it was held that a right to an education did not become a fundamental interest treated under the compelling state interest test merely because of the societal significance of education. Instead the court held that the determination of a fundamental interest focuses upon whether the right asserted is explicitly or implicitly guaranteed by the Constitution. That method of analysis must be applied here.
Traditionally, the "rational relationship" test is applied in cases involving occupational licensing, including those concerning the medical profession. (See, Williamson v. Lee Optical Co., *618 supra.) The cases recognize there is no "fundamental interest" involved in the practice of medicine (Shaw v. Hospital Authority of Cobb County, 507 F.2d 625 [5th Cir.1975]; D'Amico v. Board of Medical Examiners, 11 Cal.3d 1, 112 Cal. Rptr. 786, 520 P.2d 10 [1974]; Jones v. State Board of Medicine, supra); or in any other profession (Naismith Dental Corp. v. Board of Dental Examiners, 68 Cal. App.3d 253, 137 Cal. Rptr. 133 [1977] [dentistry]; Hawkins v. Moss, 503 F.2d 1171 [4th Cir.1974] [law]; Lombardi v. Tauro, 470 F.2d 798 [1st Cir.1972] [law]; Ostroff v. New Jersey Supreme Court, 415 F. Supp. 326 [D.N.J. 1976] [law]; Watson v. Cronin, 384 F. Supp. 652 [D. Colo. 1974] [news reporting].) The case of In re Griffiths, 413 U.S. 717, 37 L.Ed.2d 910, 93 S.Ct. 2851, cited by defendant, is inapposite because it involved the suspect classification of alienage for its turning point.
The practice of medicine is not a fundamental interest under the Constitution; therefore, defendant's equal protection argument must be gauged by the traditional "rational relationship" test. This does not mean we denigrate the importance of defendant's profession or any other recognized profession or business; we simply cannot perceive any implicit or explicit guarantee in the state or federal Constitutions for the right to practice medicine. (See, Lindsey v. Normet, 405 U.S. 56, 74, 31 L.Ed.2d 36, 50, 92 S.Ct. 862.)
Defendant first challenges the statutes because high risk physicians (surgeons, anesthesiologists, etc.) are treated the same as low risk practitioners (family doctors, general practitioners, etc.). He also challenges the statutes because they do not apply to dentists, nurses, lawyers and other professionals.
In Henry v. Bauder, supra at 753, we stated:
"... A classification employed in the exercise of police power cannot be made arbitrarily. Any distinctions inherent in a particular classification must furnish a proper and reasonable basis for such a classification. The concept of equality of all citizens under the law is, of course, basic to our free society. We have stated that classifications may not be created arbitrarily, discriminatorily or unreasonably, or the principle of equality would be violated. There must be some difference in character, condition, or situation, to justify distinction, and this difference must bear a just and proper relation to the proposed classification and regulation; otherwise, the classification is forced and unreal, and greater burdens are, in fact, imposed on some than on others of the same desert. (The State v. Heitman, 105 Kan. 139, 181 Pac. 630.)" *619 (See also, Manzanares v. Bell, supra; Reed v. Reed, supra; Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 64 L.Ed. 989, 991, 40 S.Ct. 560, 562.)
Establishment of classifications with mathematic precision is not required. In a dissenting opinion in Louisville Gas Co. v. Coleman, 277 U.S. 32, 41, 72 L.Ed. 770, 48 S.Ct. 423, Mr. Justice Holmes stated:
"... [W]hen it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark."
By the same token a statute is not infirm because it does not go as far as it might have gone. (Schilb v. Kuebel, 404 U.S. 357, 364, 30 L.Ed.2d 502, 511, 92 S.Ct. 479, reh. denied 405 U.S. 948, 30 L.Ed.2d 818, 92 S.Ct. 930; Katzenbach v. Morgan, supra at 657; Semler v. Dental Examiners, 294 U.S. 608, 610, 79 L.Ed. 1086, 1089, 55 S.Ct. 570.)
In Manzanares v. Bell, supra, this court stated:
"It should be noted that this court is not made the superintendent of legislative activity under principles of equal protection. (Griswold v. Connecticut, 381 U.S. 479, 14 L.Ed.2d 510, 85 S.Ct. 1678.) Equal protection principles do not restrain the normal exercise of governmental power, but only abuse in the exertion of such authority. The principle of equal protection is not offended against simply because the exercise of the power may result in some inequality. (Louisville & Nashville R.R. v. Melton, 218 U.S. 36, 54 L.Ed. 921, 30 S.Ct. 676.) There is no precise application of the rule of reasonableness in classifying, and equality permits many practical inequalities. There need not be an exact exclusion or inclusion of persons and things. (Magoun v. Illinois Trust & Savings Bank, 170 U.S. 283, 42 L.Ed. 1037, 18 S.Ct. 594.) The state enjoys a wide range of discretion in distinguishing, selecting, and classifying, and it is sufficient if a classification is practical and not palpably arbitrary. (Orient Insurance Company v. Daggs, 172 U.S. 557, 43 L.Ed. 552, 19 S.Ct. 281; Shelton v. Phalen, 214 Kan. 54, 519 P.2d 754; State v. Weathers, supra; Tri-State Hotel Co. v. Londerholm, 195 Kan. 748, 408 P.2d 877; Martin v. Davis, 187 Kan. 473, 357 P.2d 782, app. dismissed 368 U.S. 25, 7 L.Ed.2d 5, 82 S.Ct. 1; Board of County Comm'rs v. Robb, 166 Kan. 122, 199 P.2d 530.) `... To be able to find fault with a law is not to demonstrate its invalidity. It may seem unjust and oppressive, yet be free from judicial interference. The problems of government are practical ones and may justify, if they do not require, rough accommodations... What is best is not always discernible; the wisdom of any choice may be disputed or condemned. Mere errors of government are not subject to ... judicial review....' (Metropolis Theatre Co. v. Chicago, 228 U.S. 61, 69, 70, 57 L.Ed. 730, 734, 33 S.Ct. 441, 443.)
................
"In the areas of economic and social legislation, a statutory plan does not violate the equal protection clause merely because the classifications contained therein *620 are imperfect. (Village of Belle Terre v. Boraas, 416 U.S. 1, 39 L.Ed.2d 797, 94 S.Ct. 1536, 42 L.W. 4475; Jefferson v. Hackney, 406 U.S. 535, 32 L.Ed.2d 285, 92 S.Ct. 1724.) Nor does the equal protection clause require a state to `choose between attacking every aspect of a problem or not attacking the problem at all ...' (Dandridge v. Williams, 397 U.S. 471, 487, 25 L.Ed.2d 491, 503, 90 S.Ct. 1153, 1162.) ..." (pp. 612-15.)
We are of the opinion that equal protection is not offended by including high risk and low risk practitioners together. The legislature found the medical health care crisis was affecting all health care providers in this state although the primary impact fell on specialists in high risk areas. Even new doctors practicing in low risk fields were beginning to find it difficult, if not impossible, to obtain coverage. In addition, evidence showed that low risk practitioners needed high risk specialists in order to provide comprehensive care for their patients. Were insurance coverage unavailable for the specialists in high risk fields, the evidence indicates these professionals would either leave the state or would soon quit the practice, causing a general decline in the overall quality of health care available in this state.
The insurance commissioner testified before legislative committees that the insurance pool had to include low risk providers as well as high risk practitioners or the entire program would be actuarially unsound. We therefore find the purposes of the act and the classifications of physicians within the act were related as a means to accomplish those purposes.
Likewise, there was no denial of equal protection because the act applied to some health care providers but not to others. The record indicates that dentists and nurses asked to be excluded from the act because they were not experiencing the same malpractice problems as doctors and insurance was readily available to them through national associations. Distinguishing between one group of medical professionals and another has never been held to violate the equal protection clause if the differing treatment has a fair and substantial relationship to the purpose of the legislation. (Shaw v. Hospital Authority of Cobb County, supra at 628; Gleason v. Carlson, 92 F. Supp. 280, 285 [D. Kan. 1948]; Naismith Dental Corp. v. Board of Dental Examiners, supra at 262; McCarty v. Goldstein, 151 Colo. 154, 376 P.2d 691 [1962]. Cf., Prendergast v. Nelson, 199 Neb. 97, 256 N.W.2d 657, 669 [1977].) The fact nurses and dentists were not affected by the malpractice crisis in the same way as other health care providers *621 is sufficient on its face to demonstrate that they are a different class of persons and can be so treated by the legislature without offending the equal protection clause.
The judgment of the district court is affirmed.
HOLMES, J., dissenting.